1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

LEANN JOHNSON, on behalf of minor
child S.M.S.,

                Plaintiff,

    v.

Commissioner of Social Security,

                Defendant.

No. 1:21-cv-01704-DJC-GSA

**FINDINGS AND RECOMMENDATIONS
TO DENY PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT, TO AFFIRM
THE COMMISSIONER'S DECISION, AND
TO DIRECT ENTRY OF JUDGMENT IN
FAVOR OF DEFENDANT
COMMISSIONER OF SOCIAL SECURITY
AND AGAINST PLAINTIFF**

**(Doc. 19, 20)**

## I.    <u>Introduction</u>

      S.M.S, a minor child by and through his guardian Leann Johnson,[1] seeks judicial review[2] of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying the application for supplemental security income (SSI) pursuant to Title XVI of the Social Security Act.  Because substantial evidence and applicable law support the ALJ's decision, the recommendation is that the decision be affirmed.

## II.    <u>Factual and Procedural Background</u>

      On August 8, 2016, Plaintiff applied for SSI.  The Commissioner denied the application initially on November 10, 2016, and on reconsideration on January 24, 2017.  AR 97, 107.  A hearing was held before an Administrative Law Judge (the "ALJ") on October 2, 2018.  AR 62–87.  On March 19, 2019, the ALJ issued an unfavorable decision.  AR 1–26. After the Appeals Council denied review on January 24, 2020 (AR 35–40), this appeal followed.

## III.    <u>The Disability Standard Generally</u>

      Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the

---

[1] "Plaintiff" as used herein refers to the party, whereas "Claimant" refers to the individual minor child.

[2] The parties did not consent to the jurisdiction of a United States Magistrate Judge.  Doc. 8, 11.

Commissioner denying a Claimant disability benefits.   "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).   Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.   *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).   It is more than a scintilla, but less than a preponderance.   *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and quotations omitted).   If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.   *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).   "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. § 1382c(a)(3)(A).   An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

### IV.   Childhood Disability Standard

Pursuant to 20 C.F.R. § 416.906:

> If you are under age 18, we will consider you disabled if you have a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less

2

than 12 months. Notwithstanding the preceding sentence, if you file a new application for benefits and you are engaging in substantial gainful activity, we will not consider you disabled. We discuss our rules for determining disability in children who file new applications in §§ 416.924 through 416.924b and §§ 416.925 through 416.926a.

A three-step sequential evaluation applies: 1- is the child engaged in substantial gainful activity (if so, s/he is not disabled); 2- does the child have a severe impairment(s) (i.e. more than a slight abnormality with more than minimal functional impact) (if not, s/he is not disabled); and, 3- does the child's impairment(s) meet, medically equal, or functionally equal a Listing[3] (if not, s/he is not disabled). 20 C.F.R. § 416.924(b)-(d).

**V.    The ALJ's Decision**

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of August 8, 2016.  AR 7.

At step two the ALJ found that Plaintiff had the following severe impairments: complex partial seizures and language disorder.  AR 8.

At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or <u>medically equaled</u> the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 8.  The ALJ also determined that Plaintiff did not have an impairment or combination thereof that <u>functionally equaled</u> the severity of the listings.  AR 9–21.

Accordingly, the ALJ concluded that Plaintiff was not disabled since his application date of August 8, 2016.  AR 21.

**VI.    Issues Presented**

Plaintiff asserts one claim of error: the ALJ erred in concluding that Claimant is less than markedly impaired in the domains of: 1- *interacting and relating to others,* and 2- *health and physical well-being*.

**A.    Functional Equivalence**

**1.    Applicable Law**

Pursuant to 20 C.F.R. § 416.926a(a), to determine whether a child's impairment(s)

---

[3] 20 C.F.R. pt. 404, subpt. P, App. 1

3

functionally equal a listing, the agency assesses the child's functioning in six domains:

> (i) Acquiring and using information;
> (ii) Attending and completing tasks;
> (iii) Interacting and relating with others;
> (iv) Moving about and manipulating objects;
> (v) Caring for yourself; and,
> (vi) Health and physical well-being.

An impairment or combination of impairments functionally equals a listed impairment if it results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain. See 20 C.F.R. § 416.926a(a), (d).

A child has a "marked" limitation in a domain when the impairment(s) interferes <u>seriously</u> with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). A child has an "extreme" limitation in a domain when the impairment(s) interferes <u>very seriously</u> with the ability to independently initiate, sustain, or complete activities.

When determining functional equivalence, the agency evaluates the "whole child" by considering how the Claimant functions at home, at school, and in the community; the interactive and cumulative effects of all of the Claimant's medically determinable impairments on the Claimant's activities; and the type, extent, and frequency of help the Claimant needs.  SSR 09-1p. The agency considers statements from medical and non-medical sources when evaluating functional equivalence.

## 2.   <u>Analysis</u>

Briefly by way of background, the Claimant was involved in a motor vehicle accident in March of 2016.  Two weeks later he began experiencing intermittent seizures, behavioral abnormalities and problems with verbal articulation.  Plaintiff was classified as an older infant (11 months old) as of the August 8, 2016 application date, and was classified as a preschooler as of the ALJ's March 2019 decision date.

4

a.  **Domain Three: Interacting and Relating with Others**

The ALJ found that Plaintiff had less than a marked limitation in interacting and relating with others.  In so concluding Plaintiff contends the ALJ erroneously rejected the consultative opinion of Dr. Portnoff who examined the Claimant in June 2018 and opined he had marked limitations in interacting and relating with others.  AR  317.  That limitation was identified in a check-box questionnaire dated July 21, 2018, which was accompanied by a narrative examination report and associated opinion.  In the narrative report, Dr. Portnoff explained in relevant part that the Claimant "has delays in language, can only speak in single words and has significant articulation defect."  AR 322.

Plaintiff disputes the adequacy of the ALJ's reasoning for rejecting the same, including: 1- the subjective reports Ms. Salazar made to the consultative examiner regarding achievement of speech milestones are inconsistent with earlier treatment records (Exhibits 3F/14, 6F/12); and 2- that a less than marked limitation "was also supported by the expert medical opinion provided by Dr. Akin. . ."  Br. at 7, Doc. 19 citing AR 18.

As to the ALJ's commentary concerning Ms. Salazar's subjective reports, Plaintiff's point is reasonably well taken.  Of the two citations offered by the ALJ concerning speech milestones, the first (Ex. 3F/14) was from August 20, 2015, which predated the relevant period under review which began on the application date in August 2016, and also predated both the March 2016 motor vehicle accident and the alleged symptom onset.  The second visit from December 21, 2017 notes that Plaintiff, then age 2, was only speaking two words at a time which in fact supports Ms. Salazar's subjective report to Dr. Portnoff one year later that he was not meeting speech milestones such as being able to speak in sentences by 24 months.  AR 320.

The ALJ also appeared to draw an incorrect inference that Dr. Portnoff was basing his assessment solely on Ms. Salazar's subjective reports of Claimant's failure to meet previous

5

milestones as opposed to Dr. Portnoff's independent examination of the Claimant.  Although Ms. Salazar did provide substantial history of the Claimant's speech milestones and social development, Dr. Portnoff's recitation of that subjective history was clearly delineated as a history of the present illness.  AR 319–20.  By contrast, the speech sounds disorder and articulation defect were discussed in Dr Portnoff's objective portion, which included a mental status examination, a diagnostic impression, a discussion/prognosis section and the functional assessment.  These findings suggest they were based at least in part on Dr. Portnoff's independent examination and not solely on Ms. Salazar's subjective reports.   AR 321–22.

Nevertheless, there are several interrelated reasons why Plaintiff's argument is not altogether persuasive.  First, in the sentence immediately following the one Plaintiff quotes above, the ALJ provided additional reasoning for rejecting Dr. Portnoff's opinion, namely that "per a June 2018 neurological evaluation, the Claimant displayed fluent speech, with normal articulation, comprehension, and vocabulary (Exhibit 11F)."  AR 18.   A review of that exhibit confirms the accuracy of the ALJ's description (AR 399), and Plaintiff does not contend otherwise.

Second, verbal articulation is not entirely dispositive of social functioning.  As noted in 20 C.F.R. § 416.926a, children are not expected to be able to perform all activities within a domain, and marked limitations in any of the activities related to a domain does not necessarily mean the Claimant has overall marked limitations in that domain:

> In paragraphs (g) through (l), we describe each domain in general terms. For most of the domains, we also provide examples of activities that illustrate the typical functioning of children in different age groups. For all of the domains, we also provide examples of limitations within the domains. However, we recognize that there is a range of development and functioning, and that not all children within an age category are expected to be able to do all of the activities in the examples of typical functioning. We also recognize that limitations of any of the activities in the examples do not necessarily mean that a child has a "marked" or "extreme" limitation, as defined in paragraph (e) of this section

> 20 C.F.R. § 416.926a(b)(1)(emphasis added)

6

As Defendant emphasizes, the Commissioner's policy interpretation rulings identify various examples of typical functioning under the domain of *interacting and relating with others*. For Claimant's age group (1 to 3 years), these examples include: 1- begins to separate from caregivers, although is still dependent on them; 2- expresses emotions and responds to the feelings of others; 3- initiates and maintains interactions with adults; 4- begins to understand concept of "mine" and "his" or "hers."; 5- shows interest in, plays alongside, and eventually interacts with other children.; and 6- communicates wishes or needs, first with gestures and later with words that can be understood most of the time by people who know the child best.  SSR 09-5p, available at 2009 WL 396026, at *5.

The same ruling provides some signs that a child is deficient in this functional domain, including: 1- does not reach out to be picked up, touched, and held by a caregiver; 2- has no close friends, or has friends who are older or younger.; 3- avoids or withdraws from people he or she knows; 4- is overly anxious or fearful of meeting new people or trying new experiences; 5-has difficulty cooperating with others; 6- has difficulty playing games or sports with rules; and 7- has difficulty communicating with others (for example, does not speak intelligibly or use appropriate nonverbal cues when carrying on a conversation).  Id. at *7.  Thus, the inability to articulate oneself through intelligible speech is but one sign of deficiency in the domain of interacting and relating with others.

Relatedly, as the ALJ observed, after checking the box corresponding to a marked limitation in the domain of interacting and relating with others, Dr. Portnoff's narrative opinion explains that the Claimant had only a mild limitation in his ability to socially integrate with peers and adults in an age-appropriate manner due to his aggressiveness.  AR 322.  The ALJ explained that he found this inconsistent with the marked limitation in interacting and relating with others that Dr. Portnoff identified in the check-box questionnaire.  AR 13.

The interplay between these separately identified limitations was the subject of an extended, but somewhat unclear, discussion at the hearing between counsel, the ALJ, and the impartial testifying expert, Dr. Akins.  AR 69-78.  The ALJ and Defendant both contend that Dr. Akins' testimony supports a less than marked limitation in the domain of interacting and relating with others, whereas Plaintiff contends otherwise.  The testimony reads as follows:

> **A:** As I read this chart, there is a marked impairment noted here for interacting and relating with others.
>
> **Q:** Yes.
>
> **A:** But if that is the case, then I think that may have been perhaps a simple error, in that, if you look down into the narrative enumerations at the very bottom, under Number 3, he has mild irritability, but more significantly, can only speak in single words, with significant articulation defect. So his deficiency in communication significantly affects his interaction with others. Well, put that way, it does sound like the evaluator here is using the term significantly interchangeably with marked.
>
> **Q:** Okay.
>
> **A:** Okay? That works for me. But then when I go to the report itself, and we're looking now at Page 6
>
> **Q:** Yes, sir.
>
> **A:** -- and we look at the very bottom, under social development, it's listed that he has mild limitations in his ability to socially integrate with peers and adults in an age-appropriate manner, due to aggressiveness.
>
> **Q:** Okay. So we have an obvious or an apparent incongruity here. Well, how would you -- how would you resolve that, Doctor? What's your opinion, based upon what you're observing here, as to the level of impairment, specifically in respect to this domain of socialization?
>
> **A:** Well, it looks like the evaluator's keying in primarily on occasions when the youngster can be aggressive. And I would certainly think that would be associated with a higher level of dysfunction. But I don't know that the mere instance of finding those on occasion would somehow say that, for that category, that it's a marked impairment. So I was surprised when I came to that enumeration, here, at the end of the evaluation, because that did seem inconsistent with what had been mentioned in the medical source statement at the beginning. But I didn't think that overall, of the first page of the evaluation itself, which is Page 3 of the Exhibit 5F -- under history of present illness, does say he is aggressive to his mother and siblings. But she thinks that might be a side effect of his medication. He's not self-injurious. So given that that's the only statement that I saw that related to any difficulties with social interaction, per se, it leads me to think, well, I think that there's not much here to inform us one way or the other.
>
> **Q:** Well, can I –
>
> **A:** I wouldn't say that that statement alone would be sufficient to say that there's a marked impairment in the (b) (2) prong, or in the domain for interacting and relating with others.
>
> **Q:** Well, how do you -- how do you handle this, then, Doctor? On Page 6 of 5F,

8

again, above the social development, we see the communicative development. And here, the examining doctor has noted that the -- his finding that the child has moderate to marked limitations in his ability to communicate, understand, and initiate and use language at an age-appropriate level. So, I mean, how does that play into your thinking, as far as the opinion? And specifically, again, in regard to socialization, you have the -- we've got a mild limitation in social development, but in communication, we've got a moderate to marked. Would that support the finding that there's a marked limitation, in regard to the ability to socialize?

**A:** Well, I think the way I have to approach this is to say that you have to consider two things going on at the same time. And one of those is, there's some speech delays with articulation disorder. And in addition, there also appears to be some issue or some question about the appropriateness of the child's socialization, and the child's ability to interact and relate with others. I think if you put those together, that the comment that's made on Page 1, from the source statement again, now going back to pull that into our discussion -- he has mild irritability. So he can be cranky sometimes. But more significantly, can only speak in single words, with significant articulation defects. So his deficiency in communication significantly affects his interactions with others. So I take that to mean that the reason why that social area is significantly affected, just because of the problems with the language. And then if we look at the two sections on Fage 6, communication does say, he has a moderate to marked limitation in his ability to communicate, understand, initiate, and use language. that's primarily, I think, related to the articulation issue. Now, But he only has a mild limitation in his ability to socially integrate with peers and adults in an age-appropriate manner, due to aggressiveness. So the second one here seems to cue more on the aggressiveness. The first page seems to cue more on the language issue. So either way you look at it, I don't believe that the fact that there's a moderate to marked limitation in his ability to communicate would necessarily mean that there would automatically be a marked impairment in communication. Logically, I would think, well, if he's got a moderate to marked problem with speech, and that's impacting his social functioning, it doesn't follow that the social functioning limitation would likely be moderate to marked.

**Q:** Okay. So in your opinion, just that specific domain, Domain 3, what if any level of impairment do you think the child has?

**A:** Well, I would put it at -- for the domain analysis, I would put it as less than marked. If I were doing it as a (b) prong analysis --

**Q:** Okay. Yes.

**A:** -- under (b)(2), I would say that it was moderate to marked.

**Q:** Okay. So you're telling me, let's go back to where we left off here, which is the (b) prong of 112.02. So moderate to marked, you said, in that particular area. Let me revisit this, then. In respect to the other (b) prongs, what if any impairment do you note there?

**A:** Well, relying pretty heavily on the consultative examination, because that's pretty much the main data that we have here, I would say none for understand, remember or apply information. concentration, persistence and pace, I would say mild. Under adapt and manage, I put that at a moderate level, based upon the report that the child sometimes has meltdowns in reaction to noise sensitivity, crowds, and certain types of touching. But, again, it doesn't seem like that was an area where the child's conduct was so impactive that you would say that it was at a

marked level.

**Q:** Okay. Okay. If we go onto the analysis of whether there's a functional equals in this case, can you comment on the six domain areas, any level of impairment that you've noted there, Doctor?

**A:** Well, I didn't find any that were at a marked level. Acquiring, using information, I put as less than marked. The child had a reasonable IQ. The full scale was 87, which would be low average. There was the speech-sound disorder and the language disorder, and so using information would be included, I think, as part of what we do with language. So the fact that there are some language problems here would say that there's some impairment in that domain, but I wouldn't say that there's enough here to say that it's at a marked level. So less than marked. Attending and completing tasks, less than marked. There's not too much in here to indicate that there's any problems with concentration. And at least with regard to the ratings given by the consultative examiner, it was at a mild level. So less than marked. Number 3, interacting and relating with others, I put that as less than marked, but, you know, we've had the discussion about the interpretation. Moving about and manipulating objects, didn't see anything to indicate there were problems there, so I said less than marked. Caring for yourself, I thought this was less than marked, although it looks like there are some fine motor delays and sensory processing issues that might impact that. And then health and physical wellbeing, I don't usually offer an opinion in that domain, because it seems to call for an opinion about a physical condition. But I certainly note that there are some medical problems for this child, and I noted that Counsel had made the opening statement that perhaps Domain 6 was at a marked level. And while I wouldn't offer an opinion on that one way or the other, I would certainly say that there do appear to be some medical issues in the record that may be significant.

**Q:** Okay. Thank you, Doctor. Is there anything I haven't asked you, or we haven't covered, that you wanted us to hear before I allow Counsel to cross-examine or question you, sir?

**A:** No, I don't think so. In fact, it was Counsel that I was hoping to hear from, to see if he felt that there was something I missed or anything other than what we just looked at, that might help inform us. But the answer is no. I'd love to hear from Counsel, actually.

**ALJ:** Okay. All right. Thank you, Dr. Akins. I appreciate your testimony. Mr. Pena, if you do have questions, sir?

**ATTY:** Yes, I do. Thank you. Thank you, Doctor. What I wanted to ask was -- I'm trying to figure out where you found that there would be a moderate to marked. Was that in the domain analysis? Or was that in the (b) criteria analysis? Or any –

**ME:** Well, we don't do -- we don't do moderate to marked in the domain. So it couldn't -- that wouldn't be an answer. There's no moderate. It's either marked or less than marked. So that would be on the (b) prong side, under (b)(2).

EXAMINATION OF MEDICAL EXPERT BY ATTORNEY:

**Q:** Okay. So in the form that was completed by the doctor, the one that you noted to at 5F, 1 –

**A:** Sure.

**Q:** - - that the doctor found interacting and relating with others at marked, and then you clarified - - or rather, you analyzed the verbiage that was used at the bottom of that page.  But then, in 5F, 6, there was also the mention that there was a

moderate to marked. So where would that fall? Where would that go, in terms of either the listing argument or -- I'm sorry, the listing analysis or the domains?

**A:** Well, that's a good question. That was actually what I was trying to describe before. Let me take another stab at it. On our source statement, on Page 1, I think that what the evaluator has done is to indicate that the significant effect on interaction with others this is the Number 3 statement at the very bottom -- is because of the language deficit. It's not because of aggressiveness. It's not because of social difficulties, per se. It's because the language deficit so greatly impacts the child's ability to engage in social communication with other people. And so I think on the first page, the evaluator is tying together communication with interaction. And then when we look on Page 6, those two have sort of been separated out, so that on Page 6, there's some statements relating to communicative development -- that's where the moderate to marked comes in -- and then the discussion under social development is simply marked. So it's not real clean, because we don't have a listing, (b) prong, or a domain, that's clearly, exclusively, only about communication skills or communication development. So it does make it a little harder to tease that out. So the best that I could come up with is, when the doctor actually came to the point of writing out what the opinions were, it seemed that the opinion with regard to social was a mild limitation in the ability to socially integrate, and when the doctor was talking only about communication, that there was moderate to marked limitation in that area. I suppose, if you do separate those two out, then maybe it makes more sense to talk about the communicative development issue, under the (b) prong, (1) domain -- or, sorry, under the (b) (1) prong, because that would be for understanding, remembering, and applying information. And so it's that language issue, under applying information, where you might get a moderate to a marked impairment in (b) (1).

**Q:** Okay. Doctor –

**A:** That make sense?

**Q:** Yes, it does. Thank you, Doctor. Doctor, did you ever get a chance, or have you ever had a chance, to look at the rulings regarding the determination of the functional equivalence? It breaks down what could potentially fall within each category. For example, where communication can indeed affect the interacting with others, vice versa, where there's other elements that can fit within more than one of those domains. And the one I'm, for the record A And that's true. In fact, that's why they use the domains, is it gives you a lot more flexibility than the (b) prong does, yes.

**Q:** So just for the record, I'm referring to 09-lp, the Social Security ruling. That one describes communication as an element, a potential example of the domain of interacting with others. In your opinion, could it be that the communication, in and of itself, if we were to just remove the social aspect of Page 6, would that, standing alone, equate to a moderate to marked within interacting and relating to others?

**A:** Yeah, I think that's fair to say. I think that's essentially what the doctor did, under the source statement on page 1.

**Atty:** ATTY: Thank you so much, Doctor. And with that, I have no additional questions . . .

AR 70-79.

11

The discussion was less than clear, but perhaps could be distilled as follows: 1- that communication (or even more specifically, verbal articulation and speech sounds) is but one example within a subset under the third functional domain of interacting and relating with others; 2- that Dr. Akins would not conclude that a marked deficiency in communication would *necessarily* equate to a marked deficiency in the domain of interacting and relating with others; 3- that in and of itself, communication *could* theoretically be so significantly limited that it gives rise to a marked deficiency in the third functional domain of interacting and relating with others; and 4- that as Dr. Akins reads Dr. Portnoff's opinion, Dr. Portnoff was expressing  that the Claimant's ability to communicate was so limited by his articulation defect and speech sounds disorder that it gave rise to a marked limitation in interacting with others notwithstanding other social development limitations that were only mild in nature-- limitations that were more tethered to aggressiveness as opposed to issues with articulation and speech sounds.

Thus, the ALJ was perhaps not entirely justified in finding an inconsistency between Dr. Portnoff's check-box questionnaire which identified marked limitations in interacting and relating with others, with Dr. Portnoff's narrative opinion which identified only mild limitations in social development.  AR 13.  Although the two statements were perhaps in tension, they could potentially co-exist as explained by Dr. Akins.

Nor was the ALJ entirely justified in concluding that Dr. Akins' testimony supported a less than marked limitation in the third functional domain of interacting and relating with others.  The testimony was simply not sufficiently clear to ascertain what Dr. Akins' own opinion was on the matter, or on what basis the opinion was rendered.  Rather, the collective efforts of Dr. Akins', the ALJ, and Plaintiff's counsel at the hearing seemed to be more geared toward pinning down what Dr. Portnoff was concluding given that he examined the Claimant and completed both a check-box questionnaire and a narrative report.

More importantly however, even adopting the most Claimant friendly interpretation of Dr. Portnoff's opinion – by focusing on the check-box portion identifying marked limitations in the third functional domain and ignoring the potentially conflicting statement in the narrative opinion concerning mild limitations in social development – Dr. Portnofff's opinion, even if adopted in full, would not result in a different outcome.  Dr. Portnoff only identified one marked limitation in the functional domains and no extreme limitations, whereas satisfying the listing level functional equivalence standard requires at least two marked limitations or one extreme limitation.  See 20 C.F.R. § 416.926a(a), (d).[4]

Thus, Plaintiff fails to establish harmful error with respect to the ALJ's conclusion that the Claimant had less than marked limitations in domain three, *interacting and relating with others*.

### b. Domain Six: Health and Physical Well Being

As the ALJ explained,

> This domain considers the cumulative physical effects of physical and mental impairments and any associated treatments or therapies on a child's health and functioning that were not considered in the evaluation of the child's ability to move about and manipulate objects. Unlike the other five domains of functional equivalence, which address a child's abilities, this domain does not address typical development and functioning. The "Health and Physical Well-Being" domain addresses how recurrent illness, the side effects of medication, and the need for ongoing treatment affect the child's health and sense of physical well-being (20 CFR 416.929a(l) and SSR 09-8p) AR 20.

As the ALJ further explained,

> Social Security regulation 20 CFR 416.926a(l)(3) and SSR 09-8p set forth some examples of limited functioning in this domain that children of any age might have; however, the examples do not necessarily describe marked or extreme limitation in the domain. Some examples of difficulty children could have involving their health and physical well-being are: (i) generalized symptoms, such as weakness, dizziness, agitation ( e.g., excitability), lethargy (e.g., fatigue or loss of energy or stamina), or psychomotor retardation because of any impairment(s); (ii) somatic complaints related to an impairment (e.g., seizure or convulsive activity, headaches,

---

[4] Notably, Dr. Portnoff did not provide a response regarding the sixth domain of health and physical wellbeing, nor did Dr. Akins, but "deferred" (ostensibly because he is a psychologist and, as Dr. Akins explained, the sixth domain "seems to call for an opinion about a physical condition)."  AR 75.

incontinence, recurrent infections, allergies, changes in weight or eating habits, stomach discomfort, nausea, headaches or insomnia); (iii) limitations in physical functioning because of need for frequent treatment or therapy (e.g., chemotherapy, multiple surgeries, chelation, pulmonary cleansing, or nebulizer treatments); (iv) periodic exacerbations from an impairment(s) that interfere with physical functioning (e.g., pain crises from sickle cell anemia); or (v) medical fragility requiring intensive medical care to maintain level of health and physical well-being. AR 21.

The ALJ found Claimant had a less than marked limitations in health and physical well-being.  In so concluding, the ALJ found: 1- an August 2016 EEG was normal with no seizure activity observed; 2- despite Ms. Salazar's subjective reports that the Claimant experienced consistent seizures throughout the adjudicatory period, the record generally lacked evidence of such seizures from the time he was first diagnosed and prescribed Trileptal in August 2016 to his neurological follow up in June 2018; 3- in June 2018 it was reported that the Claimant stopped taking his prescribed medication due to unspecified side effects and began experiencing seizures again; and 4- later in June 2018, the Claimant was prescribed Keppra and there was no evidence of subsequent seizures.  AR 21.

Plaintiff disputes these findings for several reasons.  First, Plaintiff notes that the condition by its nature is based on the subjective reports of the Claimant's mother which were sufficient enough for the neurologist to diagnose complex partial seizures with impairment of consciousness and to prescribe Trileptal.  Br. at 10, Doc. 19.  Plaintiff contends that the purportedly generalized lack of evidence of recurrent seizures is not a clear and convincing reason to reject the Claimant's mother's testimony, which the ALJ was required to provide under prevailing law before rejecting subjective testimony.[5]  Br. at 11.

_____

[5] Once the Claimant establishes a medically determinable impairment that could reasonably be expected to cause some degree of pain or symptom alleged, and the ALJ finds no malingering, the ALJ must offer specific, clear, and convincing reasons for rejecting a Claimant's subjective statements about the intensity, nature and limiting effects of pain or other symptoms.  Garrison v. Colvin, 759 F. 3d 995, 1014 (9th Cir. 2014 (Citing Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996). If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a Claimant's testimony as to the severity of symptoms merely because they are unsupported by objective

As to the purported "general lack" of evidence of recurrent seizures, Plaintiff questions what the ALJ might have required given that the Claimant's mother testified that the seizures happen about 6 times a day for 8 to 15 seconds (AR 82), meaning it was unlikely a seizure would occur during a doctor's appointment in the presence of the clinician.  Plaintiff explains that "Seizures are random by nature," and that "Largely, the medical profession relies on a description of the activity." Br. at 11.

The argument is not entirely persuasive.   First, as to the normal EEG from May 2016 (AR 273), it is true as Plaintiff argues that the EEG does not rule out the possibility of seizure activity, a disclaimer set forth in the diagnostic impression itself, and even if it did it would still not be a sufficient standalone basis to reject Ms. Salazar's testimony about seizure activity as the lack of objective corroboration cannot serve as a standalone basis to reject subjective testimony.  However, objective evidence still has relevance, and the EEG presumably has some objective diagnostic value in detecting abnormal brain activity independent of the clinician's physical examination.

Further, as to the ALJ's finding that "subsequent treatment records up through approximately June 2018 generally lack evidence of recurrent seizures," this does not necessarily suggest that the ALJ required in person observation of seizures by a clinician at an appointment.[6] Rather, consistent with the ALJ's observations, "evidence of" ongoing recurrent seizure activity could presumably include: Ms. Salazar's reports of continued seizure activity;  pursuing the brain MRI order by neurology; follow up visits addressing the condition; the efficacy or lack thereof of Trileptal, side effects mitigation (rash), dosage adjustments, or novel treatment options.   For example, the ALJ explained that "from April of 2017 to May of 2018 timeframe, there were minimal, if any reports of recurrent seizures." AR 11 (citing Ex. 6F at 3–26 (AR 327–68).  Plaintiff

medical evidence. *See* <u>*Bunnell v. Sullivan*</u>, 947 F.2d 341, 347-48 (9th Cir. 1991).

[6] Though the ALJ separately noted later in the same paragraph that there were no such observations.  AR 21.

does not dispute this assertion.

Plaintiff further contends that Ms. Salazar offered a consistent account of the seizure activity, but Plaintiff cites no exams discussing the issue between the August 2016 neurology visit at Valley Children's Hospital (AR 270), and the June 2018 follow up (AR 381).  Plaintiff simply notes that the record "between the August 2016 neurology visit and the June 2018 neurology visit consisted entirely of routine pediatrician visits, [when] no neurological exam was conducted."  Br. at 11 (citing AR. 326, 328, 332, 334, 228, 340, 342, 344, 346, 348, 350, 388).  However, neither the nature of the visit, nor the specialty of the provider, would prevent the clinician from observing and noting seizure activity as obvious as Ms. Salazar described it, namely up to 15 seconds of twitching, eye rolling and momentary lapse in consciousness.  AR 80–82.  And, as mentioned, the ALJ's finding as to a general lack of evidence of seizure activity does not necessarily mean the ALJ required objective observation of a seizure by a clinician.  The ALJ separately noted several sentences later that there was no such objective observation, but this was seemingly a distinct point.

Plaintiff further asserts that because there was no substantial change in the description of the seizures, and because there is no evidence that the seizures abated (Ar. 388), there is actually no substantial evidence that refutes the finding of the reviewing doctor that found marked limitations in the domain of health and well-being ( Br. at 11),  and that it is perfectly reasonable for a patient to discontinue medication that is not only ineffective but also has negative side effects. *Id.*  Although as true as that may be, it is less reasonable for a patient to self-discontinue purportedly ineffective medication without consulting the prescribing physician -- particularly for a condition that purportedly caused serious and unabating limitations in functioning.

Plaintiff also emphasizes the prior administrative findings (PAMFs) of state agency reviewing consultant Dr. De la Rosa from the initial non-disability determination in which Dr. De la Rosa opined the Claimant had marked limitations in the sixth domain of health and physical

1
2
3
4

well-being.  However, Plaintiff's reliance on Dr. De la Rosa's PAMF is misplaced given that Dr. De la Rosa's assessment in November 2016 predated the 18-month period during which there was no evidence of consistent seizure activity or follow up by the Claimant.  AR 91-92.

5
6
7
8
9
10
11
12
13
14
15

Additionally, under no interpretation of the substantial evidence standard would the ALJ be required to affirmatively establish that the Claimant's seizures resolved as Plaintiff suggests,  rather the burden of proof as characterized under prevailing law would tend to suggest otherwise.[7]  The lack of neurological examinations for the nearly 2-year period from August 2016 to June 2018 undermines, rather than advances, Plaintiff's argument.  It suggests a lack of follow up on the Claimant's part for a condition that allegedly caused marked limitations to his health and physical well-being.  At a minimum one would expect the records to reflect consistent mention of the continued seizures, the lack of effectiveness of Trileptal, and some follow up with neurology or primary care for an alternative medication-- which neurology ultimately did by prescribing Keppra in June 2018 notwithstanding Plaintiff's contention that Keppra was also ultimately ineffective.

16
17
18

Thus, Plaintiff fails to establish harmful error with respect to the ALJ's conclusion that the Claimant had less than marked limitations in domain six--health and physical wellbeing.

19

### c.      The Medical Interrogatories

20
21
22
23
24

At the conclusion of the October 2, 2018 hearing, the ALJ stated "I do want a doctor that is trained – a physical pediatrician to look at the entire record" Ar. 85.  However, the interrogatories were sent to a psychologist, Dr. Carver, which Plaintiff contends was clear error given the ALJ clearly expressed an intention to consult a pediatrician.  Plaintiff contends that because the ALJ did

25
26
27
28

---

[7] *See* <u>Ukolov v. Barnhart</u>, 420 F.3d 1002, 1005 (9th Cir. 2005) ("The Claimant carries the initial burden of proving a disability.") (citation omitted); *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability" because the "Claimant bears the burden of proving that an impairment is disabling"); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 (1987) ("It is not unreasonable to require the Claimant, who is in a better position to provide information about his own medical condition, to do so.").

not remedy this clear error he failed his duty to develop the record and consequently was forced to play doctor.

"The ALJ has a duty to develop the record … even when the Claimant is represented by counsel." *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991).  The duty is triggered where the evidence is ambiguous or inadequate for adjudication.  *Id.*  "A specific finding of ambiguity or inadequacy of the record is not necessary to trigger this duty to inquire, where the record establishes ambiguity or inadequacy.").  *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011) (as amended)

Here, the fact that the ALJ stated an intention to obtain a pediatrician's opinion does not necessarily establish that a pediatrician's opinion was required to correct evidentiary ambiguity or insufficiency.  As Plaintiff acknowledged earlier, "the medical evidence between the August 2016 neurology visit and the June 2018 neurology visit consisted entirely of routine pediatrician visits, where no neurological exam was conducted." Br. at 11 (citing AR 326, 328, 332, 334, 228, 340, 342, 344, 346, 348, 350, 388).  Significantly, Plaintiff did not produce an opinion from these pediatricians, nor does Plaintiff otherwise point to evidence from these pediatrician visits, that would suggest marked or extreme limitations in the sixth functional domain of health and physical well-being.  Rather, Plaintiff's argument is predicated on a misstatement of law, namely that "In circumstances where the Administrative Record lacks medical opinion from a physician who reviewed all pertinent medical data, the ALJ is obligated to further develop the Claimant's medical history."  Br. at 11.  This statement of law is unsupported by citation to any social security ruling, regulation, policy interpretation or judicial opinion.  Plaintiff subsequently quotes district court authority variously addressing the prohibition of an ALJ "succumbing to the temptation to play doctor," such as by reviewing "complex laboratory findings" or "raw medical data."

In short, there was nothing unique or idiosyncratic about the events here.  As is often the case, there will exist a significant gap in time between the agency's review at the

18

initial/reconsideration determination levels and the ALJ hearing. Claimants routinely continue pursuing medical care during this time and generating new medical records. *Meadows v. Saul*, 807 F. App'x 643, 647 (9th Cir. 2020) (unpublished) (noting there "is always some time lapse between a consultant's report and the ALJ hearing and decision, and the Social Security regulations impose no limit on such a gap in time."). Thus, it stands to reason that an ALJ cannot be categorically prohibited from reviewing clinical findings from this period of time and interpreting them as an ALJ is nearly always tasked with independently reviewing some medical evidence that post-dates the agency consultant's review at the initial and reconsideration levels and forming conclusions about their functional significance. This is consistent with the ALJ's role as characterized by the Ninth Circuit. *See* *Rounds v. Comm'r Soc. Sec. Admin*., 807 F.3d 996, 1006 (9th Cir. 2015) ("the ALJ is responsible for translating and incorporating clinical findings into a succinct RFC.").

Here, for example, the ALJ did not need the assistance of medical experts or consultative guidance from a pediatrician in order for the ALJ to effectively review routine pediatrician visits and make basic non-technical observations such as the lack of complaints of recurrent seizures. *See* AR 11 ("from April of 2017 to May of 2018 timeframe, there were minimal, if any reports of recurrent seizures." AR 11 (citing Ex. 6F at 3–26 (AR 327–68)).

Thus Plaintiff fails to establish that the ALJ harmfully erred in failing to obtain a functional opinion from a pediatrician notwithstanding that the ALJ expressed an intention to do so at the end of the hearing.

**VII.** **Recommendation**

For the reasons stated above, the recommendation is that the Court find that substantial evidence and applicable law support the ALJ's conclusion that the Claimant was not disabled, that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be denied, and that the Clerk of Court be directed to enter judgment in favor of Defendant

Commissioner of Social Security and against Plaintiff Leann Johnson, on behalf of minor child S.M.S.

### VIII.   Objections Due Within 14 Days

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within fourteen (14) days after being served with these Findings and Recommendations, any party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

   Dated:   **July 7, 2024**                          **/s/ Gary S. Austin**
                                                      UNITED STATES MAGISTRATE JUDGE